COURT OF APPEALS
DECISION
DATED AND FILED

February 3, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2024AP561-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CF544

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

SOVEREIGNTY JOESEPH HELMUELLER SOVEREIGN FREEMAN,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for St. Croix County: SCOTT R. NEEDHAM, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1     PER CURIAM. Sovereignty Joeseph Helmueller Sovereign Freeman[1] appeals from a judgment, entered following a jury trial, convicting him of seven criminal counts, including first-degree reckless homicide, as a party to a crime. He also appeals from two circuit court orders denying his motion for postconviction relief. Helmueller raises several issues on appeal: (1) his constitutional right to a speedy trial was violated; (2) the evidence was insufficient to support his conviction for first-degree reckless homicide, as a party to a crime; (3) his constitutional rights to the assistance of counsel and presumption of innocence were violated due to the seating arrangements at trial; (4) his constitutional right to choose the objective of his defense was violated; (5) he was denied the constitutionally effective assistance of counsel in four respects; (6) his bail jumping charges were multiplicitous; and (7) he is entitled to resentencing. For the following reasons, we affirm.

## BACKGROUND

¶2     According to the criminal complaint, law enforcement received calls reporting a shooting in New Richmond on August 20, 2020. Law enforcement located the shooting victim, Randy,[2] who later died as a result of his gunshot wound. Witnesses informed law enforcement that an individual named "Josh" had shot Randy, that another individual named "Andrew" was with Josh, and that the two fled in a white van with no license plates.

---

[1] Consistent with his appellate briefing, we refer to Sovereignty Joeseph Helmueller Sovereign Freeman as "Helmueller" throughout the remainder of this opinion.

[2] Although not required by WIS. STAT. RULE 809.86 (2023-24), we refer to the homicide victim using a pseudonym in this opinion to protect his family's privacy. All references to the Wisconsin Statutes are to the 2023-24 version.

¶3     Law enforcement recognized the description of the white van as one belonging to Helmueller, who also went by the name "Andrew," and they identified "Josh" as Josh Cameron, an acquaintance of Helmueller. Shortly thereafter, Helmueller and Cameron were arrested.

¶4     The State subsequently charged Helmueller with one count each of first-degree reckless homicide, as a party to a crime, and second-degree recklessly endangering safety, as a repeater. The State further alleged that Helmueller was on bond in three felony cases in St. Croix County at the time of the shooting, and it charged him with three counts of felony bail jumping for violating his conditions of bond in each of those cases. After his preliminary examination, the State filed an information alleging two additional charges: possession of a firearm by a felon and carrying a concealed weapon, both as a repeater.

¶5     Following two competency hearings, withdrawal by Helmueller's first trial counsel, and numerous threatening letters[3] and refusals to appear in court by Helmueller, a jury trial began on January 24, 2022. At trial, Helmueller wore a stun belt under his shirt. Furthermore, because Helmueller had contracted COVID-19, he wore a mask and was seated six feet away from his defense counsel at a separate table.

¶6     During his defense counsel's cross-examination of the State's first witness, Helmueller made an objection, arguing that his counsel's question to the witness regarding Helmueller's drug use with Randy was "irrelevant." The circuit

---

[3] For example, in one letter sent by Helmueller to the circuit court, Helmueller called a circuit court judge previously assigned to his case a "terrorist bitch" and stated, "I hope ya get Covid and die so the people will be free from ya trampling on our rights.… I hope ya catch a stray bullet and die a slow painful death."

court stated that it would offer Helmueller a chance to speak with his defense counsel if he wanted, to which Helmueller responded, "He's not my attorney anymore. He's fired."

¶7 Outside the presence of the jury, Helmueller again stated that he "fired" his defense counsel and that he wanted a new attorney. Helmueller further commented that he felt his defense counsel was not adequately representing him and was "accusing [Helmueller] of doing drugs." The circuit court found that Helmueller had a disagreement with his defense counsel over trial strategy, "which, pursuant to a long list of cases in Wisconsin, does not constitute good cause to permit" him to end the attorney-client relationship. The court also asserted that it was "not prepared to find" that Helmueller's relationship with his defense counsel was "untenable," it noted the significant effort that had gone into finding Helmueller counsel, and it declined Helmueller's request.

¶8 Afterward, the circuit court attempted to engage in a colloquy with Helmueller regarding whether he would continue to engage in outbursts, to which Helmueller responded, "I will have you and the president of the United States shot in the head. Whose jurisdiction is that?" As a result of Helmueller's conduct, the court ordered Helmueller removed from the courtroom. When the jury returned to the courtroom, the court instructed the jury that Helmueller's absence was not to be used against him.

¶9 The trial continued for three more days, and Helmueller was provided the opportunity to observe the trial through live audiovisual means from the jail. In addition, the circuit court asked Helmueller each morning and afternoon during the remaining three days of the trial whether he wanted to return to the courtroom and attend the trial, but each time he refused.

4

¶10 Following the close of evidence, the jury found Helmueller guilty of all charges. The circuit court sentenced Helmueller to an aggregate term of 27 years of initial confinement followed by 18 years of extended supervision.

¶11 Helmueller filed a motion for postconviction relief, arguing the same issues that he raises on appeal.[4] After a *Machner*[5] hearing, the circuit court denied each of Helmueller's claims for postconviction relief.

¶12 Helmueller now appeals. Additional pertinent facts will be provided below.

## DISCUSSION

### I. Speedy trial

¶13 Helmueller first argues that the circuit court erred by denying his postconviction motion requesting that his convictions be vacated and his charges dismissed with prejudice because his constitutional right to a speedy trial was violated.

¶14 The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution. *State v. Ramirez*, 2025 WI 28, ¶30, 416 Wis. 2d 641, 22 N.W.3d 821. Consistent with United States Supreme Court precedent, we consider a four-factor balancing test to determine whether a constitutional speedy trial

---

[4] Helmueller further requested that his judgment of conviction be amended to correct two typographical errors. The State did not object to these corrections, and the circuit court amended the judgment.

[5] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

violation has occurred: (1) the overall length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The four-factor test requires consideration of the "totality of circumstances particular to the case." *Id.*

¶15    "Whether a defendant has been denied the right to a speedy trial is a constitutional question that this court reviews de novo." *State v. Leighton*, 2000 WI App 156, ¶5, 237 Wis. 2d 709, 616 N.W.2d 126. The circuit court's "underlying findings of historical fact, however, will be upheld unless they are clearly erroneous." *Id.*

### A. Length of the delay

¶16    "Before a court conducts a speedy trial analysis, the defendant 'must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay.'" *Ramirez*, 416 Wis. 2d 641, ¶31 (citation omitted). "Generally, a post-accusation delay approaching one year is considered to be presumptively prejudicial." *State v. Urdahl*, 2005 WI App 191, ¶12, 286 Wis. 2d 476, 704 N.W.2d 324. "After the defendant establishes a delay 'beyond the bare minimum needed to trigger judicial examination,' the length of the delay should then be considered in conjunction with the other factors and especially informs the prejudice inquiry." *Ramirez*, 416 Wis. 2d 641, ¶32 (citation omitted). "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." *Urdahl*, 286 Wis. 2d 476, ¶12 (citation omitted).

¶17    The parties agree that the post-accusation delay in this case was 522 days, which was just over 17 months.[6]    While this length of delay is "presumptively prejudicial," it is not "extraordinarily long."    *See Urdahl*, 286 Wis. 2d 476, ¶¶12, 37 (holding that a 21.5-month pretrial delay was "certainly a long period of time, but not extraordinarily long"); *Ramirez*, 416 Wis. 2d 641, ¶53 n.8 ("[C]ourts generally do not hold a defendant has been prejudiced as a matter of law until the delay reaches five to six years.").

### B. *Reason for the delay*

¶18    The second speedy trial factor, the reason for the delay, "examines whether the State or the defendant is more to blame for the time that passed from accusation to conviction."    *Ramirez*, 416 Wis. 2d 641, ¶39.    "When considering the reasons for the delay, courts first identify the reason for each particular portion of the delay and accord different treatment to each category of reasons."    *Urdahl*, 286 Wis. 2d 476, ¶26.    "A delay caused by the defendant is not attributed to the State.    Likewise, 'time required for the orderly administration of criminal justice' is not to be considered a 'delay' at all."    *Ramirez*, 416 Wis. 2d 641, ¶39 (citation omitted).    "This includes the time that elapses due to pretrial requirements, such as filing the complaint; conducting the initial appearance, preliminary hearing, and arraignment; setting the trial date; and hearing pretrial motions, so long as they occur 'expeditiously without delay.'"    *Id.* (citation omitted).

---

[6] At one point in his brief-in-chief, Helmueller asserts that he was held on a "high cash bail for 589 days."  This appears to be a typographical error, as it is the only reference to a delay of more than 522 days.  We also note that in his reply brief, Helmueller refers to the 522-day period, not the 589-day period.  Thus, we use the 522-day period initially referenced by Helmueller, and on which the State relies, when analyzing Helmueller's speedy trial claim.

¶19    "Delays attributable to the State are categorized as valid, neutral, or deliberate." *Id.*, ¶40.   A delay caused by the State for a valid reason is not weighed against the State. *Id.*   These include delays "'intrinsic to the case itself,' such as adjournments required for competency evaluations or the absence of an essential witness." *Id.* (citation omitted).   A delay explained by a neutral reason is weighed against the State, "but not heavily." *Id.*, ¶41.   These include delays caused by "the State's negligence, overcrowded courts, inadequate judicial resources, and mounting caseloads." *Id.*   "Periods of delay caused by deliberate or bad-faith conduct are weighed heavily against the State." *Id.*

¶20    In this case, Helmueller concedes that the 36-day period between his arrest on August 20, 2020, and his arraignment on September 25, 2020, is "likely due to the orderly administration of criminal justice" and cannot be counted against the State.   We agree that this period is "not to be considered a 'delay' at all," and we do not weigh it against either party. *See id.*, ¶39 (citation omitted).

¶21    Next, we consider the period from Helmueller's arraignment on September 25, 2020, to January 29, 2021, when Helmueller's first defense counsel filed a motion for a competency evaluation.   This period encompassed discovery, a judicial substitution request made by Helmueller,[7] and a motion for witness deposition by the State.   We agree with the State that, at most, this period of delay can be explained by neutral reasons, particularly given the volume of discovery

---

[7] The Honorable Edward Vlack was initially assigned to Helmueller's case.

relevant to the multiple-day jury trial, and we do not weigh it heavily against the State.[8]  *See id.*, ¶¶40, 48.

¶22    We next consider the period from January 29, 2021, to March 16, 2021, when the circuit court found Helmueller competent to proceed.  Because this period involved activities intrinsic to the case, this period is not considered a delay and is not weighed against either party.  *See id.*, ¶40.

¶23    Next, we consider the period from March 16, 2021, to April 5, 2021.  At the March 16, 2021 competency hearing, the circuit court scheduled a jury trial to commence on June 7, 2021, and it set a final pretrial hearing for May 20, 2021.  However, on March 30, 2021, Helmueller's first defense counsel filed a motion to withdraw, citing "a conflict of interest" and "ethical considerations."  A hearing on defense counsel's motion was held on April 5, 2021.  At the hearing, Helmueller stated that he "c[a]me to the realization" that he and his defense counsel did not

---

[8] Helmueller argues that "neither the [S]tate nor the [circuit] court offered any reason for" certain periods of delay, and, therefore, these periods must be weighed heavily against the State.  In support, Helmueller cites *State v. Ramirez*, 2024 WI App 28, 412 Wis. 2d 55, 8 N.W.3d 74, *rev'd*, 2025 WI 28, 416 Wis. 2d 641, 22 N.W.3d 821, in which this court concluded that the State's failure to explain periods of delay suggested a "cavalier disregard" for a defendant's speedy trial rights, resulting "in those portions of delay weighing heavily against the State."  *Id.*, ¶¶41, 74 (citing *State v. Borhegyi*, 222 Wis. 2d 506, 513, 588 N.W.2d 89 (Ct. App. 1998)).

On appeal from that decision, and after Helmueller submitted his briefing in this case, our state supreme court reversed this court's decision in *Ramirez* and, in doing so, overruled *Borhegyi* "to the extent it introduces a cavalier disregard standard into the constitutional speedy trial analysis."  *Ramirez*, 416 Wis. 2d 641, ¶43; 5 WAYNE R. LAFAVE et. al., CRIMINAL PROCEDURE, § 18.2(c) (4th ed. 2025) ("[W]hen the government simply offers no explanation at all, it has been held that the court 'can presume neither a deliberate attempt to hamper the defense nor a valid reason for the delay.'" (citation omitted)).

Consistent with our supreme court's decision in *Ramirez*, we do not consider the State's inability to explain certain periods of delay in this case—i.e., why the circuit court did not schedule certain hearings at an earlier date—as a reason to weigh those periods heavily against the State.

9

"agree on basically the means about which [Helmueller] intend[ed] to accomplish [his] objectives." The circuit court permitted defense counsel to withdraw, and it sent a letter to the State Public Defender's Office (SPD) stating that the court needed "an attorney appointed ASAP." Therefore, the period between March 16, 2021, and April 5, 2021, was caused by the resolution of defense counsel's motion to withdraw, which, as the State argues, is related to the orderly administration of justice and is not considered a delay. *See id.*, ¶39. Furthermore, there is nothing in the record to suggest that the resolution of defense counsel's motion did not occur "expeditiously." *See id.* (citation omitted).

¶24 We next consider the period from April 5, 2021, to July 20, 2021, when Helmueller's second defense counsel was appointed. On May 13, 2021, the circuit court held a hearing to address the SPD's efforts to obtain counsel for Helmueller. A representative for the SPD explained that the agency had searched for an attorney in the 21 surrounding counties, and 18 potential attorneys declined to accept Helmueller's case, most of whom cited heavy caseloads as the reason. Afterward, the court sent a letter to the SPD stating that the court has "followed up weekly with your staff to determine who has been appointed. On each occasion, your staff has indicated that certified attorneys are being contacted but without success." The court requested that the SPD expand its search to "all counties" in Wisconsin.

¶25 At the scheduled final pretrial hearing on May 20, 2021, the circuit court found good cause to remove the June trial date from the calendar. The court stated that it would provide the SPD "until the end of next week" to find counsel before the court "reach[ed] out to the private bar to see if we can find counsel through that alternative county payment." The court held a hearing on June 4, 2021, to again address the SPD's efforts to obtain counsel for Helmueller. At that

hearing, the court stated that it would begin to search for private bar counsel to accept Helmueller's case at county expense. The court appointed defense counsel for Helmueller on July 20, 2021, at county expense. Accordingly, the record demonstrates that the period between April 5, 2021, and July 20, 2021, was a delay caused by inadequate judicial resources and mounting caseloads.[9] These are neutral reasons for delay, and we weigh this period against the State, "but not heavily." *See id.*, ¶41.

¶26    The remaining time period between July 20, 2021, and the start of Helmueller's trial on January 24, 2022, can be explained by two causes. First, the circuit court found, in its postconviction decision, that Helmueller's second defense counsel needed additional time to prepare for trial. The court's finding is supported by the record. A status conference was held on July 30, 2021, at which defense counsel stated that he would not be prepared to proceed to a jury trial before the end of the year.[10] The circuit court then scheduled a jury trial to begin on January 24, 2022.

¶27    Helmueller argues that this period of delay must be weighed against the State because defense counsel's request was unreasonable and the circuit court

---

[9] In its decision denying Helmueller's postconviction motion, the circuit court found that Helmueller's behavior—both in sending threatening letters and in refusing to attend some hearings—extended the delay in this case, particularly by dissuading attorneys not to take his case following his first defense counsel's withdrawal, and suggested that Helmueller "did not really want a speedy trial." Helmueller argues that there is no evidence in the record to support these findings. We assume without deciding that Helmueller's conduct did not contribute to the delays and did not evidence a desire to waive his speedy trial rights.

[10] At the *Machner* hearing, defense counsel explained that his statements at the July 30, 2021 status conference were based on "the volume of material in this case" and that his "schedule didn't permit [him] to spend that much time working on a case like this until that time frame." Defense counsel stated that Helmueller "agreed to postpone a trial until the end of that year" and that counsel would not have accepted the case had Helmueller not agreed to that time frame.

accepted defense counsel's "statement without further record or inquiry" and "without consulting Helmueller." While the State agrees that an attorney's request for time to prepare for trial "cannot be interpreted as a willful delay or used to circumvent the right to a speedy trial" under *Hadley v. State*, 66 Wis. 2d 350, 360, 225 N.W.2d 461 (1975), it asserts that *Hadley* does not stand for the proposition that "a defense attorney's reasonable request for more time to prepare could somehow be counted against the State."

¶28 We agree with the State and conclude, given the record before the circuit court as outlined above, that defense counsel's request for additional time to prepare for trial was reasonable, particularly given counsel's *Machner* hearing testimony. Thus, the delay from counsel's appointment on July 20, 2021, to the start of Helmueller's trial on January 24, 2022, was, at most, caused by a reason intrinsic to the case—i.e., newly appointed defense counsel preparing for trial—and cannot be counted against the State. *See Ramirez*, 416 Wis. 2d 641, ¶40; *Hadley*, 66 Wis. 2d at 360; *Vermont v. Brillon*, 556 U.S. 81, 85 (2009) ("[D]elays sought by counsel are ordinarily attributable to the defendants they represent.").

¶29 The second cause related to the circuit court ordering a second competency evaluation for Helmueller. At a September 29, 2021 pretrial conference, defense counsel raised the issue of Helmueller's competency based on Helmueller's then-recent behavior. On November 18, 2021, the court found Helmueller competent to proceed. This overlapping reason for the delay from September 29, 2021, to the court's second competency finding is likewise intrinsic

to the case, and this delay cannot be counted against the State.[11] *See **Ramirez***, 416 Wis. 2d 641, ¶40.

¶30    In summary, none of the periods of delay in this case were caused by deliberate or bad-faith conduct on behalf of the State.  The only periods of delay counted against the State—totaling 232 days—were caused by "neutral reasons" and are not weighed heavily against the State.  *See **id.***, ¶41.  The remaining periods—totaling 290 days—were either not to be considered "delays" at all or were delays caused by valid reasons and are not weighed against either party.  Consequently, we weigh the second ***Barker*** factor against the State, albeit not heavily, for 232 days of delay.  *See **Ramirez***, 416 Wis. 2d 641, ¶48.

### C. Assertion of speedy trial right

¶31    "A defendant's assertion of the speedy trial right is 'entitled to strong evidentiary weight' because it 'is in itself probative of prejudice.'"  ***Id.***, ¶49 (citations omitted).  Here, Helmueller, through counsel, made a request for a speedy trial at the arraignment on September 25, 2020, and again after the circuit court found him competent to proceed the first time.  In addition, Helmueller filed multiple pro se letters throughout the case referencing his speedy trial demands, and, in at least one of these letters, he requested dismissal of his charges and release from custody as a result of his continued detention without a trial.  Accordingly, this factor weighs in Helmueller's favor.

---

[11] We question whether the period between September 29, 2021, and November 18, 2021, constitutes a "delay" at all because it did not result in the January 24, 2022 trial being rescheduled.  To the extent this period constituted a delay, it was intrinsic to the case and is not counted against the State.

### D. Prejudice and balancing

¶32 "We consider three interests in assessing whether a defendant suffered prejudice due to a prolonged delay before trial: oppressive pretrial incarceration; anxiety and concern; and the possibility the defense will be impaired." *Id.*, ¶51. "[A] defendant need not show prejudice in fact to evince a speedy trial violation." *Leighton*, 237 Wis. 2d 709, ¶25.

¶33 Helmueller argues that he was prejudiced by the delay in this case because he "endured prolonged pretrial incarceration and suffered extreme anxiety and distress while this case was pending." It is true that imposing consequences of pretrial detention "on anyone who has not yet been convicted is serious." *Barker*, 407 U.S. at 533. "[T]ime spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time." *See id.* at 533-34 (footnote omitted).

¶34 Nevertheless, as discussed above, the majority of the reasons that Helmueller's trial did not take place until January 2022 cannot be attributed to the State. Under these circumstances, Helmueller's arguments regarding pretrial incarceration, anxiety, and concern have a minimal impact on our analysis. *See United States v. Lewis*, 116 F.4th 1144, 1167 (10th Cir. 2024) (concluding that a defendant had failed to show for purposes of a speedy trial violation claim that he experienced "'concern and anxiety over his impending trial' any different 'from that of any other arrestee awaiting trial'" (citation omitted)); *United States v. Chavez*, 979 F.2d 1350, 1354-55 (9th Cir.1992) (reaching a similar conclusion in a challenge to delay in processing an appeal).

14

¶35    Helmueller further contends that his defense was impaired by the delay in this case because by the time his trial commenced on January 24, 2022, one witness, Ben Carlson, had died and another, Gary Gores, was unavailable to testify due to health issues.  "The United States Supreme Court has recognized that impairment to the defense is the 'most serious … because the inability of a defendant adequately to prepare his [or her] case skews the fairness of the entire system.'"  *Leighton*, 237 Wis. 2d 709, ¶23 (citation omitted).  The defense may be impaired in this context if: (1) witnesses die or disappear during a delay; (2) defense witnesses are unable to recall accurately events of the distant past; or (3) a defendant is hindered in his or her ability to gather evidence, contact witnesses, or otherwise prepare his or her defense.  *Id.*

¶36    As the State notes, Carlson died on October 31, 2020, approximately two months after Helmueller's arrest, and "[a]ny undue delay was immaterial to [this witness's] unavailability at trial."  Helmueller does not respond to the State's argument regarding this witness, and we therefore deem this issue conceded. *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that an appellant's failure to respond in his or her reply brief to an argument made in the respondent's brief may be taken as a concession).

¶37    Furthermore, Gores was a witness for the State, and it was known early in the proceedings that his health was declining.  Due to Gores' declining health, the State moved, unsuccessfully, to depose Gores and have that testimony introduced at trial.  We agree with the State that Helmueller "provides no reason to believe that [this witness's] testimony would have helped, rather than harmed, his defense."  If anything, the delay in this respect hampered the State's case because Gores was unavailable to testify at trial.  Accordingly, Helmueller has failed to

15

demonstrate any prejudice to his defense as a result of his prolonged pretrial detention.

¶38 In sum, balancing the four *Barker* factors, Helmueller's constitutional right to a speedy trial was not violated. Although he invoked his right to a speedy trial, the majority of the 17-month period that Helmueller spent in pretrial detention was either time required for the orderly administration of criminal justice or was caused by reasons intrinsic to the case itself, including delay required for Helmueller's defense counsel to effectively represent him at trial. Further, Helmueller has failed to make any particularized showing of prejudice and relies almost exclusively on the total length of the delay attributable to the State to show prejudice as a matter of law. *See Ramirez*, 416 Wis. 2d 641, ¶54. The 17 months Helmueller spent in pretrial detention does not constitute prejudice as a matter of law. *See id.*, ¶53 n.8. Given the facts of this case, Helmueller is not entitled to the "severe remedy" of dismissal of his charges. *See id.*, ¶55 (quoting *Barker*, 407 U.S. at 522).

## II. Sufficiency of the evidence

¶39 Helmueller next asserts that the evidence presented at trial was insufficient to prove, beyond a reasonable doubt, that he directly committed, or aided and abetted Cameron in committing, first-degree reckless homicide.

¶40 "This court independently reviews whether the evidence was sufficient to sustain the jury verdict, 'but in so doing, we view the evidence most favorably to sustaining the conviction.'" *State v. Hibbard*, 2022 WI App 53, ¶9, 404 Wis. 2d 668, 982 N.W.2d 105 (citation omitted). "Evidence is insufficient to support a conviction only if, viewed most favorably to the State, it 'is so insufficient in probative value and force that it can be said as a matter of law that

16

no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'" *Id.* (quoting *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990)). "This court will only substitute its judgment for that of the trier of fact when the fact[]finder relied upon evidence that was inherently or patently incredible—that kind of evidence which conflicts with the laws of nature or with fully-established or conceded facts." *State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990).

¶41 To prove first-degree reckless homicide, the State must demonstrate, beyond a reasonable doubt, that the defendant (1) caused the death of another, (2) by criminally reckless conduct, (3) under circumstances that showed utter disregard for human life. WIS JI—CRIMINAL 1022 (2015); WIS. STAT. § 940.02(1).

¶42 WISCONSIN STAT. § 939.05(1) states that a person "concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it." As is relevant here, a person is concerned in the commission of the crime if he or she "[d]irectly commits the crime" or "[i]ntentionally aids and abets the commission of it." Sec. 939.05(2)(a), (b). Aiding and abetting means that with the knowledge that another person is going to commit a crime, the defendant knowingly either assisted in its commission or was ready and willing to assist in its commission. WIS JI—CRIMINAL 400 (2005); *Hibbard*, 404 Wis. 2d 668, ¶12.

¶43 We conclude that the evidence adduced at trial was sufficient for the jury to convict Helmueller of directly committing first-degree reckless homicide or intentionally aiding and abetting the commission of that crime. In August 2020, Randy and Gores lived at a fourplex, and Helmueller was in the process of moving

into Gores' apartment. It is undisputed that on the night of the shooting, Randy hosted a gathering with his former girlfriend, Tammy Osborne. Also present at the party were Emma Boladeres-Alcina, Gores, Carlson, and Justin Delaria.

¶44 Osborne testified that Randy went downstairs to Gores' apartment to "get methamphetamine." Minutes later, Randy returned "screaming that he's been shot." According to Osborne and Boladeres-Alcina, Randy was shouting "Josh shot me."

¶45 Boladeres-Alcina testified that at some point during the party, she was standing outside the fourplex when a white van drove up and reverse parked in the driveway. She stated that she observed Cameron in the driver's seat and Helmueller in the passenger seat. Boladeres-Alcina testified that Cameron and Helmueller then went into Gores' apartment and that Randy entered the apartment after them. Not even "a few minutes" later, Randy was shot, and Boladeres-Alcina saw Helmueller and Cameron hurriedly enter the van and drive away. Boladeres-Alcina further observed Helmueller "holding something" "like … a box" upon exiting Gores' apartment.

¶46 Another witness, Jennifer Burke, testified that Cameron and another individual whom she did not recognize (later determined to be Helmueller) came to her residence shortly before the shooting asking for her fiancé, Brandon Fletch. Burke explained to Cameron and Helmueller that Fletch was not home, and the two left. Fifteen minutes later, Cameron and Helmueller returned to Burke's home. Cameron, who was carrying a case of beer with him, told Burke that he wanted to "look at" Fletch's rock collection. Cameron eventually entered Burke's garage carrying the case of beer and began looking through Fletch's rock collection. He remained in the garage for approximately ten minutes, and then he

and Helmueller left. The following morning, Fletch and Burke went into the garage and located a firearm in Fletch's rock collection.

¶47 Burke's home was equipped with surveillance cameras, and portions of her interaction with Cameron and Helmueller were played for the jury. The video showed Helmueller and Cameron arriving at Burke's house the second time. After exiting the vehicle, Helmueller removed a gun from his waistband and placed it inside the beer box that Cameron carried with him into the garage. Helmueller then left the residence in the white van by himself.

¶48 Cameron testified that he met Helmueller through Randy approximately one year before the shooting and that all three were involved in drug activity together. Cameron testified that he did not possess any firearms in August 2020 because law enforcement seized his firearms from his residence in October 2019. However, Cameron stated that Helmueller owned a .22-caliber pistol, and he described the firearm as having no "grips." Cameron testified that Helmueller came to his residence approximately one month before the shooting to show Cameron the pistol. Cameron also testified that he informed police about Helmueller's gun. A detective confirmed at trial that law enforcement had raided Cameron's home in October 2019 and seized firearms pursuant to a warrant, that Cameron had worked as an informant, and that Cameron informed him ten days before the shooting that Helmueller had a .22-caliber pistol.

¶49 Cameron testified that on the day of the shooting, Helmueller came over unannounced. After Helmueller's arrival, he and Cameron purchased a case of beer at a liquor store. Cameron and Helmueller then drove separately to the fourplex so that Helmueller could retrieve cat litter for Cameron's cat. Cameron further testified that "there was talk about selling" the .22-caliber pistol. Cameron

19

stated that upon arriving at the fourplex, Helmueller entered the residence and Cameron stayed outside. The two then drove separately to Burke's residence because Cameron "was going to see if [Fletch] wanted to buy a firearm," but he was not home. Afterward, according to Cameron, he left his vehicle at Burke's residence and he and Helmueller drove together back to the fourplex because Helmueller forgot his pistol when retrieving the cat litter. Helmueller again went inside while Cameron waited outside.

¶50 Cameron stated that Helmueller came running out of the fourplex, "held a gun to [Cameron]," and instructed him to drive away. Cameron testified that he did not hear a gunshot and did not know that Helmueller had shot Randy. Cameron testified that he drove back to Burke's residence so that he could retrieve his vehicle and "get rid of the gun."

¶51 We agree with the State that Cameron's testimony was sufficient to prove, beyond a reasonable doubt, that Helmueller directly committed first-degree reckless homicide. Helmueller disputes this conclusion by arguing that Cameron's testimony was "contrary to all of the other evidence in the case" and that the State "conceded that Cameron was the shooter." Helmueller is correct that Osborne and Boladeres-Alcina both testified that Randy stated that "Josh" had shot him. In fact, a law enforcement officer testified that he provided aid to Randy after the shooting and that Randy told him that "Josh" had shot him.

¶52 However, Cameron's testimony that he did not pull the trigger was not "inherently or patently incredible," despite the parties at trial viewing his testimony as self-serving. *See Tarantino*, 157 Wis. 2d at 218. Even if parts of Cameron's testimony were incredible, the jury could still determine that Helmueller pulled the trigger based on the evidence presented. Boladeres-Alcina

20

saw both Cameron and Helmueller enter Gores' apartment before the shooting. Likewise, law enforcement confirmed that Cameron had his firearms seized before the shooting, and evidence suggested that Helmueller owned the firearm used to kill Randy. Even more, Helmueller was in possession of the firearm upon arrival at Burke's residence following the shooting, law enforcement located .22-caliber ammunition in Helmueller's room at Gores' apartment, and Helmueller's DNA was present on the firearm, while Cameron's DNA was not.

¶53 Furthermore, contrary to Helmueller's argument on appeal, the State did not concede or stipulate to the fact that Cameron was the shooter. *See id.* Although the State's theory of the case was that Cameron was the shooter, it also argued in its closing argument that the jury could find Cameron more credible. The State argued, "But if somebody thinks, you know what? I actually believe Josh Cameron, he didn't go in, and [Helmueller] shot [Randy]. You can think that. The other 11 can think it's aiding and abetting, and it still would be a guilty verdict."

¶54 Alternatively, viewed in the light most favorable to the State, the evidence presented at trial was sufficient to prove, beyond a reasonable doubt, that Helmueller intentionally aided and abetted Cameron in the commission of first-degree reckless homicide. To begin, we reject Helmueller's argument that to convict him for aiding and abetting first-degree reckless homicide, the State was required to prove that Helmueller "knew that Cameron intended" to cause Randy's death. As the State asserts, first-degree reckless homicide does not require proof of intent to cause death. *See* WIS JI—CRIMINAL 1022 (2015); WIS. STAT. § 940.02(1). Nor was the State required to prove *why* Helmueller and Cameron decided to commit the crime. Rather, as the State contends, to prove that Helmueller aided and abetted Cameron in committing first-degree reckless

homicide, it was only "required to show … that Helmueller knew Cameron would shoot someone and willingly assisted him."[12]

¶55   Here, the jury could reasonably have found that Helmueller knowingly assisted Cameron or was ready and willing to assist Cameron. The jury heard from at least three witnesses that the firearm used in the shooting belonged to Helmueller and that any firearms owned by Cameron had been seized prior to the shooting. The jury could reasonably infer that Helmueller provided the firearm to Cameron or that he instructed Cameron on where to locate the firearm in Gores' apartment. The jury also heard evidence that Helmueller and Cameron spent the hours prior to the shooting together; that Cameron and Helmueller arrived together at the fourplex in Helmueller's white van; that they parked backwards in the driveway; that they hurriedly fled the scene together in Helmueller's van after the shooting; and that Helmueller assisted in hiding the firearm at Burke's residence. As the State said during its closing argument:

> The evidence showed that [Helmueller] and [Cameron] were in it together the entire way. They went to the scene together, they shot him together, they left together. They ditched the gun together. They used [Helmueller's] vehicle. [Helmueller's] gun. [Helmueller] provided the means. He aided and abetted the homicide.

¶56   Helmueller contends that evidence regarding his conduct after the shooting "may show that he knew something illegal had happened, but it doesn't prove that, prior to the shooting," he "was ready and willing to assist" Cameron. We disagree. Helmueller fails to cite any authority prohibiting a jury from

---

[12] Helmueller does not dispute this assertion in his reply brief. Notably, Helmueller does not argue in reply that the State was required to prove that he knew Cameron would shoot Randy, as opposed to "someone."

considering a defendant's conduct after the commission of a crime when assessing a defendant's intent or knowledge. Evidence of Helmueller's conduct before the shooting—coupled with his behavior after the shooting—was sufficient to prove, as a matter of objective fact, that Helmueller knowingly assisted Cameron in the commission of the crime or was ready and willing to assist Cameron in committing that crime. *See* **Hibbard**, 404 Wis. 2d 668, ¶12.

¶57 Helmueller further argues that "[n]one of the evidence suggested that [Helmueller and Cameron] went to the apartments looking for [Randy], or planned to confront or engage him in an argument." "Most importantly," argues Helmueller, "there was absolutely no evidence about what happened inside Gores' apartment." While it is true that there was no direct evidence presented about what, exactly, transpired inside of Gores' apartment, a "conviction may be supported solely by circumstantial evidence." *See* **State v. Mertes**, 2008 WI App 179, ¶11, 315 Wis. 2d 756, 762 N.W.2d 813. Furthermore, as explained above, the State did not need to prove why Cameron shot Randy or why Helmueller and Cameron entered the apartment. In fact, the State acknowledged in its closing argument that it could not explain "why [Randy] went down into that apartment of Gary Gores. I can't tell you why Josh Cameron and Andrew Helmueller did.… But that's not an element for you to consider."

¶58 In short, when viewed in the light most favorable to the State, a reasonable trier of fact could have found that Helmueller either directly committed first-degree reckless homicide or intentionally aided and abetted Cameron in the commission of that crime.

### III. Presumption of innocence and the right to counsel

¶59    Next, Helmueller argues that he is entitled to a new trial because the circuit court erroneously exercised its discretion during the trial when it seated him at a separate table, slightly behind his defense counsel, after Helmueller contracted COVID-19.    Helmueller also asserts that the court's decision violated his constitutional rights to counsel and the presumption of innocence.  According to Helmueller, the seating arrangements "undermined the presumption of innocence and adversely affected Helmueller's ability to communicate with his attorney."

¶60    "The right to a fair trial is guaranteed by the sixth and fourteenth amendments to the United States Constitution." *State v. Clifton*, 150 Wis. 2d 673, 679, 443 N.W.2d 26 (Ct. App. 1989).  "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  A defendant's right to due process, and therefore the presumption of innocence, is violated when, for example, the state requires a defendant to appear at trial in identifiable prison clothing. *Id.* at 512; *see also Clifton*, 150 Wis. 2d at 679.

¶61    However, the risk of undermining the fairness of the factfinding process may not always be avoided.  For example, the United States Supreme Court has upheld the practice of shackling a defendant when necessary to control a "contumacious defendant." *Estelle*, 425 U.S. at 505; *Deck v. Missouri*, 544 U.S. 622, 632 (2005) ("[G]iven their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case.").

¶62    Additionally, "the Constitution, in order to help the accused secure a meaningful defense, provides him [or her] with a right to counsel." *Deck*, 544

24

U.S. at 631. One of the defendant's primary advantages of being present at the trial is his or her "ability to communicate with his [or her] counsel." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). The United States Supreme Court has suggested that interference with a defendant's "ability to communicate" with his or her defense counsel—for example, by shackling the defendant—"diminishes" his or her right to counsel and can violate the Sixth Amendment. *See Deck*, 544 U.S. at 631.

¶63 A circuit court maintains discretion to decide whether to impose any restrictions on a defendant in the courtroom. *See State v. Grinder*, 190 Wis. 2d 541, 550, 527 N.W.2d 326 (1995). "Consequently, a decision should not be reversed unless it can be shown that the court erroneously exercised its discretion." *Id.* at 551; *see also Deck*, 544 U.S. at 633 (stating that the constitution "permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling"). The court in this case also made factual findings regarding the seating arrangements at trial. Findings of fact will not be set aside unless clearly erroneous. WIS. STAT. § 805.17(2). However, this court "independently reviews whether deprivation of a constitutional right has occurred." *State v. Jones*, 2010 WI 72, ¶23, 326 Wis. 2d 380, 797 N.W.2d 378.

¶64 Here, Helmueller contracted COVID-19 just prior to the jury trial. Therefore, pursuant to the circuit court's order, Helmueller wore a mask and sat approximately six feet away from his defense counsel at a separate table during the trial. Under these circumstances, we conclude that the circuit court did not erroneously exercise its discretion by taking these precautionary measures, and Helmueller's constitutional rights to counsel and the presumption of innocence were not violated.

¶65     As an initial matter, and contrary to Helmueller's contention on appeal, the circuit court directly addressed why Helmueller was being required to wear a mask and sit at a separate table from his defense counsel. Prior to the start of voir dire, and outside the presence of the prospective jurors, the court stated:

> Mr. Helmueller, I'm going to explain your distancing from your attorney, for purposes of social distancing. I think it makes sense you're wearing a mask. I know that there have been positive cases [of COVID-19] in the jail, and so I think for everyone's protection, but certainly anytime you need to talk to [defense counsel], we're going to have enough breaks you'll be able to do that either here or back in the holding cells.

Therefore, the court's decision was "the product of a rational mental process by which the facts of record and law relied upon" were "stated and … considered together for the purpose of achieving a reasoned and reasonable determination."[13] *See* ***Grinder***, 190 Wis. 2d at 550-51 (citation omitted).

¶66     The circuit court's discretionary decision also complied with Helmueller's constitutional right to counsel. Helmueller was assured that there would be enough breaks during the trial so that he would have ample opportunity to consult with defense counsel. Helmueller was also provided with a pad of paper to write notes to defense counsel if needed. Defense counsel testified at the ***Machner*** hearing that he slid his chair over multiple times to speak with Helmueller during the trial. As the circuit court found in its decision denying

---

[13] Helmueller contends in his reply brief that the State "concedes that the [circuit] court erroneously exercised its discretion when it failed to make a record or consider relevant factors before requiring Helmueller to sit apart from counsel at trial." We disagree. The State referenced the circuit court's decision in its briefing with appropriate record citation, correctly stating that the court imposed the seating arrangements that it did because Helmueller had contracted COVID-19.

Helmueller's postconviction motion, Helmueller was at no time "restricted from or prevented from consulting with his attorney."

¶67    Helmueller argues that the circuit court's finding that he was not restricted from communicating with defense counsel is clearly erroneous. In support, Helmueller cites his own testimony from the *Machner* hearing, wherein he stated that he was not able to easily speak with defense counsel during the trial and that he "didn't feel comfortable moving towards" counsel because of his stun belt and prior interactions with law enforcement. However, this testimony was contradicted by defense counsel's statements that he did not feel that his communication with Helmueller was impeded or that he and Helmueller could not interact during the trial due to the seating arrangements. We will not reweigh witness credibility on appeal. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶26, 290 Wis. 2d 264, 714 N.W.2d 530.

¶68    Importantly, Helmueller was removed from the courtroom during his defense counsel's cross-examination of the State's first witness. Despite offers to return, Helmueller remained absent from the courtroom for the duration of the trial. Thus, we agree with the State that "Helmueller cannot credibly complain about a lack of access to his attorney during his trial given that he was voluntarily absent for nearly the entire four-day trial." *See State v. Anthony*, 2015 WI 20, ¶58, 361 Wis. 2d 116, 860 N.W.2d 10 ("[A] defendant may forfeit a fundamental constitutional right through conduct incompatible with the assertion of the right.").

¶69    The circuit court's discretionary decision also complied with Helmueller's presumption of innocence. Unlike a defendant being shackled during a trial, a defendant seated at a table six feet from his defense counsel while wearing a mask, at a time when social distancing and face masks were

27

commonplace, would not have "suggest[ed] to the jury that the justice system itself sees a 'need to separate a defendant from the community at large'" due to the defendant's dangerousness or culpability. *See Deck*, 544 U.S. at 630 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)). In addition, Helmueller was actually seated closer to the jury than defense counsel, minimizing the risk that the jury would perceive him as violent. Accordingly, the circuit court's failure to instruct the jury regarding the reason for the seating arrangements is of no significance.

¶70 Further, after his removal from the courtroom and while outside the presence of the jury, there was a commotion in which Helmueller loudly screamed. The jury confirmed that it had heard yelling, and the circuit court later informed the jury that Helmueller had "expressed some emotions" and would not be returning to the courtroom that day. The court instructed the jury not to consider Helmueller's absence in deciding his guilt. Helmueller argues that his seating arrangements, when considered in conjunction with his removal from the courtroom and his actions thereafter, affected his presumption of innocence and his right to counsel because the jury could have concluded that Helmueller was separated from defense counsel due to his dangerousness.[14]

¶71 As we have discussed, however, the seating arrangements did not cause Helmueller's removal or his outburst, and given the common COVID-19 precautions at the time, did not affect Helmueller's presumption of innocence, nor

---

[14] Helmueller claims on appeal that he was dismissed from the courtroom during the trial "[d]ue to his inability to privately consult with counsel." There is no factual support in the record for this assertion. Helmueller was removed from the trial after stating that he would have the circuit court judge "and the president of the United States shot in the head."

cause the jury to conclude he was dangerous. To the extent, if any, that the jury may have considered Helmueller dangerous, that was not due to the courtroom seating arrangements, but due to Helmueller's own actions, which resulted in the jury hearing a commotion, his yelling, and ultimately, his removal from the courtroom. *See Estelle*, 425 U.S. at 505.

## IV. Objective of the defense

¶72 Helmueller next argues that his constitutional right to choose the objective of his defense was violated when, at trial, his defense counsel conceded guilt to the charges of felon in possession of a firearm, carrying a concealed weapon, and one count of bail jumping. We review this issue independently of the circuit court. *See Jones*, 326 Wis. 2d 380, ¶23.

¶73 Under the Sixth Amendment, defense counsel is entitled to make "the decisions regarding trial management," while "some decisions 'are reserved for the client.'" *State v. Chambers*, 2021 WI 13, ¶15, 395 Wis. 2d 770, 955 N.W.2d 144 (citation omitted). Pertinent here, "'[a]utonomy to decide that the objective of the defense is to assert innocence' belongs in the category of decisions reserved for the defendant alone." *Id.*, ¶18 (alteration in original; citation omitted). If, after consultations with defense counsel concerning the management of the defense, the defendant disagrees with counsel's strategy of conceding guilt, it is not open to counsel to override the defendant's objection. *See McCoy v. Louisiana*, 584 U.S. 414, 424 (2018).

¶74 However, "when the defendant 'neither consents nor objects' to a strategy of conceding guilt, such decisions are within the scope of counsel's strategic choices." *Chambers*, 395 Wis. 2d 770, ¶16 (citation omitted). "If a client declines to participate in his [or her] defense, then an attorney may

permissibly guide the defense pursuant to the strategy [he or] she believes to be in the defendant's best interest." *McCoy*, 584 U.S. at 424. Importantly, under *McCoy*, "[c]ounsel, in any case, must still develop a trial strategy and discuss it with [his or] her client, explaining why, in [his or] her view, conceding guilt would be the best option." *Id.* at 423.

¶75 Our state supreme court has concluded that to succeed on a *McCoy* claim, a "defendant must show that he or she expressly asserted that the objective of *his or her* defence is to maintain innocence of the charged criminal acts and the lawyer did not abide by that objective and overrode it by conceding guilt." *Chambers*, 395 Wis. 2d 770, ¶20 (citation modified).

¶76 Here, we conclude that Helmueller cannot succeed on his *McCoy* claim. Even if we assume that defense counsel conceded guilt on the three charges, the record supports the circuit court's finding that "Helmueller was generally unresponsive during discussions of trial strategy, and never verbally approved or protested [defense counsel's] proposed approach." Thus, defense counsel could "permissibly guide the defense pursuant to the strategy" he believed to be in Helmueller's best interest. *See McCoy*, 584 U.S. at 424.

¶77 Defense counsel conceded at the *Machner* hearing that Helmueller declined the plea offers presented by the State, declined to stipulate to his status as a felon, and declined to concede that he was on bond at the time of the shooting. However, defense counsel stated that he most likely *did* have a specific discussion with Helmueller about possibly conceding guilt on the less serious charges. Specifically, defense counsel testified that he "tried to persuade Mr. Helmueller to at least consider reducing the amount of information the jury was going to find out about his other charges and about the nature of those charges." Defense counsel

further stated that he tried explaining to Helmueller that he wanted "to get him out of the most serious charges" and that he "mentioned" to Helmueller that conceding guilt on the less serious charges "was a strategy that [he] could … use."

¶78    According to defense counsel, Helmueller did not inform counsel whether he agreed or disagreed with conceding guilt on some charges. Defense counsel stated that, generally speaking, he did not know what Helmueller "wanted to do" in terms of the objective of the defense. Defense counsel further stated that he "was basically on [his] own, trying to figure out what [he] could do to best get an outcome for [Helmueller] that was going to avoid conviction of the most serious charges." Defense counsel testified that Helmueller "was particularly difficult to deal with," and Helmueller would sometimes refuse to speak or meet with counsel ahead of trial. When Helmueller would speak with defense counsel, Helmueller would "become agitated and angry" after about five minutes. Defense counsel stated that Helmueller would eventually "calm down" and they would "have a conversation … for a few more minutes. And then the whole thing would repeat itself." Defense counsel further stated that he "spent about four hours with [Helmueller] before trial to talk about" trial strategy, but "we got very few issues dealt with."

¶79    Helmueller contends that the circuit court's finding that Helmueller never verbally approved or protested defense counsel's proposed approach is clearly erroneous. In support, Helmueller cites his own testimony from the *Machner* hearing and the undisputed fact that he refused to stipulate to certain facts or enter a plea. He also cites defense counsel's *Machner* hearing testimony that he did not discuss with Helmueller a strategy of conceding guilt on the less serious charges.

¶80    Defense counsel testified that he either had discussions with Helmueller about trial strategy, including the *possibility* of conceding guilt on some charges, or that he was "sure" and "suspect[ed]" that he would have had such a conversation with Helmueller.  To the extent defense counsel's testimony was somewhat contradictory, the circuit court made credibility determinations that we will not second-guess.  *See **Royster-Clark, Inc.***, 290 Wis. 2d 264, ¶26.  The court's finding on this issue is supported by the fact that Helmueller did not interject or otherwise oppose defense counsel's opening statement at trial that the jury "will find that Mr. Helmueller has committed a crime here, maybe more than one, but he's not guilty of the homicide."  *See **McCoy***, 584 U.S. at 424.  While such an objection is not "necessarily requir[ed]" to preserve a ***McCoy*** claim, *see **Chambers***, 395 Wis. 2d 770, ¶19 n.6, Helmueller's silence—particularly in light of his frequent outbursts—supports the court's finding.

¶81    In short, even assuming that defense counsel conceded Helmueller's guilt on the less serious charges, Helmueller never objected to defense counsel's strategy or clearly stated that he wanted to maintain his innocence on all charges. Defense counsel was therefore permitted to tailor the defense strategy as he saw fit, subject to ineffective assistance of counsel jurisprudence.  *See **McCoy***, 584 U.S. at 424.  Helmueller does not argue that defense counsel's strategy was constitutionally unreasonable.  Thus, defense counsel did not err even if he conceded guilt on some charges.

## V.  Ineffective assistance of counsel

¶82 Helmueller next contends that defense counsel provided constitutionally ineffective assistance by (1) introducing Cameron's testimony regarding the shooting; (2) failing to object to the seating arrangements at trial;

(3) failing to introduce evidence regarding a conflict between Cameron and Delaria; and (4) failing to object to a detective's hearsay testimony.

¶83 A criminal defendant has a constitutional right to the effective assistance of counsel. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial." *Id.*, ¶37. "If the defendant fails to satisfy either prong, we need not consider the other." *Id.*

¶84 "To establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" *Id.*, ¶38 (citation omitted). "In general, there is a strong presumption that trial counsel's conduct 'falls within the wide range of reasonable professional assistance.'" *Id.* (citation omitted). Additionally, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference." *Id.* (alteration in original; citation omitted).

¶85 "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *Id.*, ¶37. "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

¶86 The circuit court, in denying each of Helmueller's ineffective assistance of counsel claims, found that Helmueller "failed to show that any of [defense counsel's] strategic decisions were outside the range of professionally competent assistance or that his performance fell below an objective standard of reasonableness." The court stated that defense counsel "offered plausible

explanations for his performance, or lack thereof, which were reasonable under the circumstances."

### A. Cameron's testimony

¶87 Helmueller contends that defense counsel rendered constitutionally ineffective assistance "when he introduced testimony from Cameron which, if believed, would support a finding that Helmueller directly committed first-degree reckless homicide."

¶88 The State elicited testimony from Cameron on direct examination regarding what occurred on the day of the shooting, but it stopped short of asking him questions about the shooting. At the *Machner* hearing, defense counsel testified that he introduced Cameron's testimony about the shooting in order to discredit him as a witness. Specifically, defense counsel stated that "by that point what [Cameron] had to say about the other facts that the State did elicit … w[as] so incredibly contrary to all the other witnesses that the jury was not going to believe what he said." Defense counsel also testified that he expected the State to elicit testimony from Cameron about the shooting on redirect.

¶89 We agree with the circuit court that defense counsel's trial strategy in cross-examining Cameron was objectively reasonable. By questioning Cameron about the shooting, defense counsel was able to discredit Cameron's credibility as a witness as part of the defense's overall strategy to demonstrate that "Cameron was the one shooting. [Helmueller] had no knowledge of that at all." Indeed, defense counsel was able to read into the record Cameron's former trial testimony to demonstrate that Cameron was providing a materially different version of events than he had at his trial. Defense counsel used Cameron's testimony to argue in his closing argument that Cameron "is essentially a liar and

will do whatever is expedient for him." As Helmueller concedes, the State "likely didn't elicit that testimony [on direct-examination] because it knew it would raise questions about Cameron's credibility, thus undermining the strength of the other testimony he provided."

¶90 While Cameron's testimony may have provided a basis for the jury to find Helmueller guilty of directly committing the shooting, we are "highly deferential" to counsel's strategic decisions and make every effort "to eliminate the distorting effects of hindsight." *See Breitzman*, 378 Wis. 2d 431, ¶65 (citation omitted). Defense counsel's decision was reasonable and not "irrational or based on caprice." *See id.*, ¶75.

*B. Seating arrangements*

¶91 Helmueller next asserts that to the extent we "conclude that [he] forfeited any challenge to the seating arrangements by not objecting at trial, or actually requesting them, he argues that he was denied the effective assistance of counsel." Because we have concluded that the circuit court's order regarding the seating arrangements did not violate Helmueller's right to counsel or his presumption of innocence, defense counsel did not perform deficiently by failing to object to them. *See State v. Berggren*, 2009 WI App 82, ¶21, 320 Wis. 2d 209, 769 N.W.2d 110 (stating that an attorney does not perform deficiently by failing to raise a meritless objection).

*C. Evidence of conflict*

¶92 Helmueller further argues that his defense counsel rendered constitutionally ineffective assistance by failing to "introduce evidence regarding Cameron's conflict with" Delaria "on the date of the shooting." Helmueller

asserts that "[t]his additional information would've provided the jury with more background and context to understand why Cameron and Helmueller were looking for [Delaria]" and "why Cameron may have shot [Randy]." He also argues that this evidence would have demonstrated that Cameron's decision to shoot Randy was "spontaneous" and would have therefore created a "reasonable probability" that the jury would have acquitted him of aiding and abetting Cameron.

¶93 Boladeres-Alcina testified at trial that Delaria had left before Helmueller and Cameron arrived at the fourplex and that Cameron had asked her where he could find Delaria. A police report dated September 4, 2020, which was not introduced at trial, stated that Delaria told law enforcement that he and Boladeres-Alcina were at Cameron's residence the day of the shooting. According to Delaria, an argument ensued about a picture of a "T-shirt with … a dog on it" located on Boladeres-Alcina's cellphone. Delaria stated that Cameron became "angry" and "g[o]t in [Boladeres-Alcina's] face." The police report further outlined that Delaria told law enforcement that Boladeres-Alcina told Randy about the altercation. Delaria said that Boladeres-Alcina's story "didn't seem to bother [Randy] too much" but that Randy "would stick up for [Boladeres-Alcina]."

¶94 Another police report, also not introduced at trial, recounted that law enforcement interviewed Boladeres-Alcina on August 27, 2020. Boladeres-Alcina provided a similar version of events surrounding the altercation with Cameron at his apartment. However, she stated that after telling Randy about the altercation, Randy said that he would "take care of it."

¶95 We agree with the State that defense counsel did not perform deficiently by failing to elicit evidence about these police interviews. The information related to the confrontation would have harmed, not helped,

36

Helmueller's defense. As the State suggests, "Hearing that Helmueller brought Cameron to the [fourplex] (and gave him a gun) in order to settle a score with Delaria would have helped prove his guilt, not his innocence," as it would have demonstrated that Helmueller had the knowledge that Cameron would shoot someone. This conclusion is supported by evidence that Cameron and Helmueller asked for Delaria upon arriving at the fourplex and by Delaria's comments to law enforcement that Helmueller had a firearm, that Delaria was worried Helmueller would shoot him, and that Helmueller and Cameron might have been at the fourplex to shoot him.

### D. Detective's testimony

¶96 In addition, Helmueller argues that his defense counsel rendered constitutionally ineffective assistance by failing to object to a detective's alleged hearsay testimony at trial. The State informed the circuit court that it was going to introduce evidence from Detective Carlos de la Cruz of the New Richmond Police Department that Cameron had informed him prior to the shooting that Helmueller possessed a .22-caliber pistol. The State argued that this testimony was admissible pursuant to WIS. STAT. § 908.01(4)(a)2. Defense counsel responded, stating that he was "[o]riginally" going to object but that he had "changed [his] mind." Consistent with the State's offer of proof, de la Cruz testified that he met with Cameron on August 10, 2020, and that Cameron informed him that Helmueller "was in possession of a .22-caliber revolver."

¶97 At the *Machner* hearing, defense counsel testified that Helmueller wanted that evidence admitted because "it proved that Cameron knew that he had a gun or that there was a gun available." According to defense counsel, Helmueller believed that, when considered in relation to the fact that Cameron had

ammunition at his residence and that Cameron wanted to sell the gun to Fletch, Detective de la Cruz's testimony demonstrated that "Cameron was the one that … pulled the trigger."

¶98  Assuming without deciding that Detective de la Cruz's testimony was inadmissible hearsay, we agree with the State that defense counsel's decision not to object to the testimony was a deliberate strategic decision made at Helmueller's request, and Helmueller cannot now claim that this strategic decision constitutes deficient performance.  *See **Strickland v. Washington***, 466 U.S. 668, 691 (1984) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); ***United States v. Weaver***, 882 F.2d 1128, 1140 (7th Cir. 1989) ("Where a defendant, fully informed of the reasonable options before him [or her], agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel.").

## VI. Multiplicity

¶99  Helmueller next contends that the three felony bail jumping charges were multiplicitous because there was only one "bond" and each charge was based on one volitional act (felon in possession of a firearm or carrying a concealed weapon).

¶100  "Claims are multiplicitous when the State charges a defendant more than once for the same offense." ***State v. Brantner***, 2020 WI 21, ¶24, 390 Wis. 2d 494, 939 N.W.2d 546.  "Such charges violate our state and federal constitutions because they place the defendant in jeopardy of multiple convictions for the same offense." ***Id.***  "Whether two or more charges are multiplicitous is a question of law subject to our independent review." ***Id.***, ¶8.

¶101 "We review multiplicity claims according to a well-established two-pronged methodology." *Id.*, ¶25 (citation omitted). "First, we employ the 'elements-only' test to determine whether the offenses are identical in both law and fact." *Id.* (citation omitted). "If the offenses are identical in law and fact, we presume 'that the legislature *did not* intend to permit multiple punishments.'" *Id.* (citation omitted). "The State may rebut that presumption only by a clear indication of contrary legislative intent." *Id.* (citation omitted). "If the offenses differ in law or fact, then they are not the 'same' for double jeopardy purposes, and we therefore presume that the statutes allow for cumulative punishment." *Id.* (citation omitted). "The defendant can overcome the presumption if he [or she] can prove that, notwithstanding the separate offenses, 'the legislature did not intend to authorize cumulative punishments.'" *Id.* (citation omitted).

¶102 Offenses are identical in fact "unless they are 'separated in time or are of a significantly different nature.'" *Id.*, ¶26 (citation omitted). "Charges are 'different in nature even when they are the same types of acts as long as each required a new volitional departure in the defendant's course of conduct.'" *Id.* (citation omitted). In other words, "[a]n offense is different in nature from another offense when it requires proof of a fact that the other offense does not." *State v. Eaglefeathers*, 2009 WI App 2, ¶11, 316 Wis. 2d 152, 762 N.W.2d 690 (2008).

¶103 Here, Helmueller signed a signature bond form that was captioned with St. Croix County Case No. 2020CF381, and a condition of his release was that he "shall not commit any crime." The form stated under the "Additional Conditions of Release" heading that the signature bond "also include[d]" St. Croix County Case Nos. 2019CF637 and 2020CF385. (Formatting altered.)

¶104 Felony bail jumping has three elements. In this case, the State was required to prove for each bail jumping charge that: (1) Helmueller was charged with a felony; (2) Helmueller was released from custody on bond; and (3) Helmueller intentionally failed to comply with the terms of that bond. *See* WIS. STAT. § 946.49(1); WIS JI—CRIMINAL 1795 (2018). We therefore reject Helmueller's contention that "[t]o establish whether the [bail jumping] offense is a misdemeanor or felony, the [S]tate must prove whether the underlying case was a misdemeanor or felony, but that isn't an element of the offense itself."

¶105 The existence of one bond form for all three underling felony charges does not render the bail jumping charges multiplicitous. As the State argues, "[e]ach of Helmueller's three bail jumping convictions required proof of a different fact because the first element, the felony charge, was different." Count 4 alleged that Helmueller was charged with a felony in St. Croix County Case No. 2019CF637; Count 5 alleged that Helmueller was charged with a felony in St. Croix County Case No. 2020CF381; and Count 6 alleged that Helmueller was charged with a felony in St. Croix County Case No. 2020CF385. Significantly, the State was required to prove that Helmueller was on bond in each of those cases and that the bond in each case had the condition that he not commit any other crime. Therefore, even though each charge involved the same statute, different facts distinguished one count from another.[15] *See State v. Davison*, 2003 WI 89, ¶41, 263 Wis. 2d 145, 666 N.W.2d 1; *Eaglefeathers*, 316 Wis. 2d 152, ¶11.

---

[15] Helmueller does not argue that the legislature did not intend to authorize cumulative punishments. *See State v. Brantner*, 2020 WI 21, ¶25, 390 Wis. 2d 494, 939 N.W.2d 546.

## VII. Resentencing

¶106 Finally, Helmueller argues that the circuit court erroneously exercised its discretion by denying Helmueller's request for new defense counsel at sentencing and by denying his postconviction motion for resentencing on this issue.

¶107 "[I]f at any time during the proceeding a defendant makes a substantial complaint that could reasonably be interpreted as a request for new counsel, the trial judge should inquire whether there are proper reasons for substitution." *State v. Kazee*, 146 Wis. 2d 366, 371, 432 N.W.2d 93 (1988). "Once such a request is made, it is within the trial court's discretion to determine whether a proper factual basis exists for appointing new counsel." *Id.*

¶108 In evaluating whether a circuit court erroneously exercised its discretion by denying a motion for substitution of counsel, a reviewing court must consider a number of factors, including: (1) the adequacy of the circuit court's inquiry into the defendant's complaint; (2) the timeliness of the motion; and (3) whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case. *State v. Lomax*, 146 Wis. 2d 356, 359, 432 N.W.2d 89 (1988).

¶109 Under the first consideration, "[i]f the reasons for the defendant's request are made known, or are apparent, the court may exercise its discretion without further inquiry." *Kazee*, 146 Wis. 2d at 372. Similarly, "[i]f a defendant repeatedly makes such requests without any further evidence of the attorney's incompetency or conflict, the trial court may summarily conclude without a full inquiry that the request is merely a ploy to disrupt the trial process." *Lomax*, 146

Wis. 2d at 361. "But the exercise of the court's discretion must be on an informed basis." *Kazee*, 146 Wis. 2d at 372. "With regard to the third consideration, to warrant substitution of appointed counsel, a defendant must show good cause, such as conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *State v. Wanta*, 224 Wis. 2d 679, 703, 592 N.W.2d 645 (Ct. App. 1999).

¶110 "When we review a discretionary decision, we examine the record to determine if the circuit court logically interpreted the facts, applied the proper legal standard, and used a demonstrated rational process to reach a conclusion that a reasonable judge could reach." *Id.* at 689.

¶111 As outlined previously, Helmueller stated on the first day of trial that he "fired" his defense counsel. Helmueller further commented that he felt that his defense counsel was not adequately representing him and that counsel was "accusing [Helmueller] of doing drugs." Outside the presence of the jury and following a recess, the circuit court found that Helmueller had a disagreement with his defense counsel over trial strategy, "which, pursuant to a long list of cases in Wisconsin, does not constitute good cause to permit" Helmueller to "fir[e]" his counsel. The court also asserted that it was "not prepared to find" that Helmueller's relationship with his defense counsel was "untenable," it noted the significant effort that had gone into finding Helmueller counsel, and it declined Helmueller's request.

¶112 On the second day of the jury trial, the circuit court "complete[d] the record from" the first day of trial regarding Helmueller's request to "fire" his defense counsel. The court stated that it "[g]enerally … would have conducted a colloquy with Mr. Helmueller relative to why he wanted a different attorney,

whether a new attorney would make a difference, if he's been cooperative with his attorney, et cetera." However, the court commented that, given Helmueller's "state of mind, so to speak, there was no opportunity nor purpose in trying to conduct that colloquy. Simply stated, Mr. Helmueller was out of control with his expletives as well as threats, so the Court will find that a colloquy would have been of no use or benefit."

¶113 The circuit court further found that "good cause has not been shown to allow" defense counsel "to be relieved from further representation" and that the "dissatisfaction or frustration by Mr. Helmueller with [his defense counsel] could not rise to degree that continued representation would lead to an unjust verdict." The court continued by finding that Helmueller was attempting to "fire" his defense counsel as "a ploy" to thwart, delay, and impede "this matter from proceeding."

¶114 The issue of Helmueller's representation arose again at sentencing. As the State was presenting its sentencing recommendation, Helmueller objected, arguing that he had "fired" his defense counsel on the first day of trial. Specifically, Helmueller stated:

> I object based on the fact [defense counsel] was fired on January 24th of this year, on the first day of the trial. District attorney and the Court proceeded through the trial, along with [defense counsel], outside of my presence after my attorney was fired. I have not yet been informed that I am under arrest. Where is the damn man, woman, or child, UCC 308 and the 14th Amendment, your Honor.

The circuit court overruled Helmueller's objection, stating that it would proceed with the sentencing hearing. Helmueller then stated that the court was "violating [his] rights" and that he would have the circuit court judge "and the president of the United States killed, and the Pentagon blown up. That's federal, bitch. You

can't fucking proceed now, can you." The court held Helmueller in contempt, and he was removed from the courtroom but permitted to watch and listen through live audiovisual means.

¶115 We agree with the State that when considered in context, it is unclear whether Helmueller was requesting a new attorney or was having an outburst similar to those he had throughout the circuit court proceedings. "In situations involving appointment of new counsel, a circuit court's exercise of discretion is triggered by a defendant's presentation of a substantial complaint that could be interpreted as a request for new counsel." *State v. McDowell*, 2004 WI 70, ¶66, 272 Wis. 2d 488, 681 N.W.2d 500. Helmueller's statements about having previously "fired" his defense counsel at trial did not constitute a "substantial complaint that could be interpreted as a request for new counsel" at his sentencing hearing. *See id.*

¶116 To the extent Helmueller was requesting new counsel, he forfeited the right for the circuit court to conduct a colloquy because his outburst resulted in his removal from the courtroom. *See Anthony*, 361 Wis. 2d 116, ¶58. Even so, the court had previously exercised its discretion at trial when confronted with Helmueller's "firing" of defense counsel. Helmueller does not challenge the court's findings that he had failed to show good cause to remove his counsel mid-trial or that Helmueller was making his request to cause delay. These findings could reasonably be extended to the court's decision to continue with sentencing, and we will not revisit them sua sponte.

*By the Court.*—Judgment and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

44